UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF SADGER,

      Plaintiff,                           Case No. 2:20-cv-11900
                                           District Judge Stephen J. Murphy, III
v.                                      Magistrate Judge Kimberly G. Altman

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.      Introduction

This is a social security case.  Plaintiff Jeff Sadger (Sadger) brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits (DIB) and Social Security Income (SSI) under the Social Security Act (the Act).  Both parties have filed summary judgment motions (ECF Nos. 13, 15), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 15) be GRANTED,

1

Sadger's Motion for Summary Judgment (ECF No. 13) be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.    Background

### A.    Procedural History

Sadger was 41 years old at the time of his alleged date of onset of January 1, 2017.  (ECF No. 11, PageID.229, 231).  He worked as a dunnage laborer, custodian, cold end operator, machinist, clerk, and general laborer from 1999 through 2017.  (*Id.*, PageID.259).  He alleged disability due to degenerative disc disease, agoraphobia with panic disorder, chronic back pain, traumatic brain injury, torn meniscus (right knee), carpal tunnel (right hand), and hypertension.  (*Id.*, PageID.252).

After Sadger's DIB and SSI applications were denied at the initial level on October 1, 2018 (*Id.*, PageID.113-158), he timely requested an administrative hearing, which was held on July 12, 2019, before the Administrative Law Judge (ALJ).  (*Id.*, PageID.66-112).  Sadger testified at the hearing, as did a vocational expert (VE).  (*Id.*).

Sadger testified that he lived with his mother and grandmother in his grandmother's house.  (*Id.*, PageID.71).  Sadger graduated from high school, but did not complete college or any vocational training.  (*Id.*, PageID.73-74).  Sadger was able to assist his mother with carrying groceries.  (*Id.*, PageID.92-93).  He

believed that carrying 50 pounds would be "really pushing it." (*Id.*, PageID.92).

He was able to take 30-minute walks, but his knees hurt him because of his

degenerative disc disease. (*Id.*, PageID.93). Sadger also suffered from migraines,

and the sound of a vacuum aggravated him and caused headaches. (*Id.*,

PageID.93-95). Climbing a flight of stairs was "not comfortable" for him." (*Id.*,

PageID.94). Sadger was able to operate a riding lawnmower, but doing so hurt his

back. (*Id.*, PageID.95). Sadger had difficulty using his hands. (*Id.*, PageID.95).

He had carpal tunnel in his left hand and had previously injured his right hand.

(*Id.*, PageID.95-96). He did not have full strength in his right hand and

experienced pain. (*Id.*, PageID.96).

Sadger stated that he had suffered from anxiety his entire life. (*Id.*,

PageID.96-97). After being assaulted, which included 20 to 30 hits to the head,

Sadger's psychological problems worsened. (*Id.*, PageID.96-98). The assault

occurred on November 16, 2000, and Sadger was able to hold jobs after the assault.

(*Id.*, PageID.98). However, as a result of the assault, Sadger began to suffer mood

swings, lose his patience more easily, and get migraines. (*Id.*, PageID.98-99). He

was prescribed Klonopin to help with his anxiety and other symptoms. (*Id.*,

PageID.99).

In addition to the Klonopin, Sadger took Amlodipine, Lisinopril, and

Metoprolol ER for high blood pressure. (*Id.*, PageID.100). Sadger also stated that

his obesity made him "[s]luggish" and that he tried to walk every day but could not always do so because of his knee pain. (*Id.*, PageID.101). Walking also caused him back and neck pain because of a car accident that occurred in or around 2010. (*Id.*, PageID.101-102). Sadger attended group therapy approximately once each week and individual therapy at least once each month. (*Id.*, PageID.102-103). Sadger suffered from frequent panic attacks with his most recent one occurring in the car on the way to the hearing. (*Id.*, PageID.103-104).

On August 20, 2019, the ALJ issued a written decision finding that Sadger was not disabled. (*Id.*, PageID.48-61). On June 9, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, PageID.36-40). Sadger timely filed for judicial review of the final decision. (ECF No. 1).

### B.    Medical Evidence

Sadger received chiropractic care with Craft Chiropractic Center from March 14, 2017 through June 11, 2019. (ECF No. 11, PageID.438-463, 754-786). His most recent records reflect diagnostic impressions of thoracic segmental dysfunction, pain in thoracic spine, cervical segmental dysfunction, degenerative disc disease at C4-C5 level, degenerative disc disease at C5-C6 level, and cervicalgia. (*Id.*, PageID.785). He rated his pain as a seven out of ten. (*Id.*). His prognosis was "fair." (*Id.*).

4

Sadger regularly treated with the Oaklawn Medical Group from July of 2017 through June of 2019.  (*Id*., PageID.372-433, 801-850).  Sadger's problem list as of his most recent appointment included hyperlipidemia, obesity, malignant hypertension, hypertensive disorder, acute sinusitis, pharyngitis, acute bronchitis, pyrexia, headache, cough, and tear of medial meniscus of knee.  (*Id*., PageID.802). His records also reflect that he had a gallbladder removal surgery along with three separate surgeries on his right hand.  (*Id*., PageID.803).

Sadger was hospitalized from June 28, 2017 through July 2, 2017 with right groin cellulitis and sepsis.  (*Id*., PageID.414).  On July 11, 2017, Sadger had an appointment with Oaklawn Medical Group to discuss his recent hospitalization. (*Id*., PageID.412).  Sadger reported that his right groin pain and fatigue were improving.  (*Id*.).  He reported no depression, anxiety, or excessive alcohol use. (*Id*.).  Sadger was "healthy-appearing, well-nourished, and well-developed," but was in "mild distress."  (*Id*.).  He also had "persistent swelling and erythema" on his abdomen.  (*Id*., PageID.414-415).

On July 21, 2017, Sadger presented for an appointment.  (*Id*., PageID.410). He complained of cellulitis of the groin.  (*Id*., PageID.412).  Sadger was "healthy-appearing, well-nourished, and well-developed," but was in "mild distress."  (*Id*., PageID.411).  He had a "normal mood and affect and [was] active and alert."  (*Id*.).

5

On November 8, 2017, Sadger presented complaining of daily headaches. (*Id.*, PageID.404).  When having a headache, Sadger experienced lightheadedness and tonal vision.  (*Id.*).  He had recently been treated for sinus issues and an ear infection.  (*Id.*).  Sadger's blood pressure was 190/124.  (*Id.*).  It was noted that Sadger was in "moderate distress and acutely ill."  (*Id.*, PageID.406).  However, he had "normal mood an affect" and was "very talkative."  (*Id.*).  His hearing was also decreased, and he was experiencing sinus tenderness.  (*Id.*).  Sadger was prescribed medications for high blood pressure, Lisinopril and Toprol XR, counseled regarding a low sodium diet, and told to get lab work drawn.  (*Id.*, PageID.407).  He was also prescribed Fluticasone for his sinus problems.  (*Id.*).

On November 10, 2017, Sadger presented complaining of high blood pressure.  (*Id.*, PageID.402).  His blood pressure was 167/122.  (*Id.*).  On November 13, 2017, Sadger presented again complaining of high blood pressure.  (*Id.*, PageID.400).  His blood pressure was 147/100.  (*Id.*).  Sadger reported "feeling a little light headed but not where he is dizzy."  (*Id.*).  Sadger was instructed to monitor his blood pressure and return to the office if he developed new symptoms.  (*Id.*, PageID.402).

On November 17, 2017, Sadger presented complaining of hypertension. (*Id.*, PageID.398).  On November 21, 2017, Sadger followed up regarding his hypertensive disorder.  (*Id.*, PageID.395).  He reported muscle aches, joint pain,

6

and back pain, but denied any swelling or weakness.  (*Id.*, PageID.397).  He also

reported anxiety but denied any depression.  (*Id.*).  He further complained of sinus

problems.  (*Id.*).

On December 6, 2017, Sadger presented for his annual examination.  (*Id.*,

PagID.388).  Sadger was "healthy-appearing, well-developed, and obese."  (*Id.*,

PageID.392).  He was also "ambulating normally."  (*Id.*).  He had "good

judgement," "normal mood and affect and active and alert," was oriented "to time,

place, and person," and both his recent and remote memory was "normal."  (*Id.*).

Sadger did not report any muscle aches, muscle weakness, joint pain, or back pain.

(*Id.*, PageID.391).  He also did not report any depression or anxiety.  (*Id.*).

On February 7, 2018, Sadger complained of redness and irritation of his left

eye as well a headache and congestion.  (*Id.*, PageID.382, 385).  He also reported

that he was not currently taking his cholesterol medication.  (*Id.*, PageID.382).

Sadger was "ambulating normally" and his mental status was "anxious."  (*Id.*).  He

was referred to a neurologist for his headache.  (*Id.*, PageID.385).

On March 5, 2018, Sadger had a neurology appointment to address his

headaches.  (*Id.*, PageID.416).  He reported headaches since being beaten with a

shovel handle 18 years earlier.  (*Id.*).  The headaches had been worsening over the

last month.  (*Id.*).  Sadger was diagnosed with migraines, and MRIs were ordered.

(*Id.*, PageID.419).

On March 22, 2018, Sadger had an MRI of his cervical spine that found "[n]o evidence of an acute osseous or soft tissue abnormality of the cervical spine or cervical spine cord." (*Id.*, PageID.365-366). However, "[r]ight-sided degenerative uncinate hypertrophy at C4-C5 result[ed] in moderate-to-severe stenosis of the right central canal and potential compromise of the exiting right C5 nerve root. Correlate[d] clinically for right C5 radiculopathy. There [was] no critical central canal stenosis at any level." (*Id.*, PageID.366). An MRI of the brain from the same day was normal. (*Id.*, PageID.366).

On May 15, 2018, Sadger presented with pain on the right side of his abdomen that had been ongoing for about five weeks. (*Id.*, PageID.375-378). He also complained of a headache, joint pain, and muscle pain. (*Id.*, PageID.378). Sadger was "ambulating normally" and his mental status was "anxious." (*Id.*).

On June 13, 2018, Sadger complained of eye issues. (*Id.*, PageID.844). He was prescribed eye drops. (*Id.*, PageID.845). Sadger reported joint and back pain, but no muscle aches or weakness. (*Id.*, PageID.846). He also reported "depression and anxiety." (*Id.*). He was noted to be in "moderate distress," but was "healthy-appearing [and] well-developed" in general appearance. (*Id.*, PageID.847).

On June 20, 2018, Sadger presented complaining of edema. (*Id.*, PageID.840). Specifically, he "state[d] lower legs and feet swollen after starting [C]restor 40 mg." (*Id.*). Sadger reported that he was not experiencing migraines,

8

headaches, depression, or anxiety. (*Id*., PageID.843). His mental status was "anxious," but he was oriented "to time, place, and person." (*Id*.).

On August 21, 2018, Sadger was seen for a checkup and lab follow-up. (*Id*., PageID.836). Sadger reported fatigue, congestion, and joint pain as well as edema. (*Id*., PageID.839-840). Again, Sadger's mental status was "anxious," but he was oriented "to time, place, and person." (*Id*., PageID.839).

On October 30, 2018, Sadger presented complaining of a cough that was not helped by non-prescription medications. (*Id*., PageID.833). Sadger had a "normal mood and affect" and was "very talkative." (*Id*., PageID.835). He was diagnosed with an acute upper respiratory infection. (*Id*., PageID.836).

On May 23, 2019, Sadger presented complaining of back and right shoulder pain. (*Id*., PageID.810, 812). He reported anxiety and depression but was oriented "to time, place, and person" with normal recent and remote memory. (*Id*., PageID. 812). (*Id*.). Sadger was advised to take his prescribed medications and adhere to a weight loss diet. (*Id*., PageID.814).

On June 14, 2019, Sadger had a follow-up appointment to address his hypertensive disorder. (*Id*., PageID.801). Sadger reported "joint pain and swelling in the extremities but report[ed] no muscle aches, no muscle weakness, and no back pain[.]" (*Id*., PageID.803). He also reported migraines. (*Id*.). He did not report any depression or anxiety. (*Id*.). It was noted that Sadger had "normal

9

mood and affect and [was] active and alert." (*Id*., PageID.804).  He was also

"oriented to time, place, and person."  (*Id*.).

Sadger received mental health care at Summit Pointe from March 10, 2017

through May 21, 2019, and his records reveal a history of anxiety, substance abuse,

and bipolar disorder.  (*Id*., PageID.465-601, 652-734).  Sadger received both

individual and group therapy.  (*Id*.).  His most recent group session notes, dated

May 21, 2019, indicated that his mood/affect, thought process/orientation,

behavior/functioning, medical condition, and substance abuse were all

unremarkable.  (*Id*., PageID.654).  He was not found to be a danger to himself or

others.  (*Id*.).

Sadger received physical therapy from Oaklawn Physical Rehabilitation

Center from March 21, 2018 through May 15, 2018.  (*Id*., PageID.622-650).  Out

of eight sessions, he had one no show and three cancellations.  (*Id*.).  His chief

complaints when presenting to physical therapy were headache, back pain, and

neck pain.  (*Id*.).  His discharge summary states that his "prognosis [was] good."

(*Id*.).

Sadger treated with Khurram J. Khan, M.D. for pain management purposes

from February 20, 2019 through March 6, 2019.  (*Id*., PageID.615-651, 735-753).

On February 20, 2019, Sadger presented to Dr. Khan for a pain evaluation

complaining of "mild back pain that radiates into his head."  (*Id*., PageID.615-

616).  He rated the pain an eight out of ten in general.  (*Id*., PageID.615).  He

reported "[i]ntermittent" suicidal ideation as well as depression and anxiety.  (*Id*.,

PageID.616).

Dr. Khan appeared to review a CT of Sadger's abdomen and pelvis.  (*Id*.,

PageID.605).  The impression was "[r]ight groin adenopathy and cellulitis" and

"[f]atty transformation liver without focal abnormality."  (*Id*.).  Dr. Khan also

appeared to review a January 14, 2015 MRI of Sadger's knee, which showed a

"[p]eripheral horizontal tear in the posterior horn of the medial meniscus."  (*Id*.,

PageID.651).

On February 20, 2019, Sadger was administered Botox injections for

migraines.  (*Id*., PageID.606).  He was also referred for a physical therapy

evaluation and a thoracic spine MRI was ordered.  (*Id*.).  The thoracic spine MRI

performed March 2, 2019 was "unremarkable."  (*Id*., PageID.614).  On March 6,

2019, Sadger received a bilateral greater and occipital nerve block using local

anesthetics and steroids as well as a right thoracic myofascial trigger point block

using local anesthetics and steroids.  (*Id*., PageID.609-614).

On June 18, 2019, Jay Skaggs, a licensed professional counselor (LPC),

completed a mental residual functional capacity evaluation form for Sadger.  (*Id*.,

PageID.787-792).  Skaggs had been treating Sadger twice each month since 2012.

(*Id*., PageID.787).  Skaggs stated that Sadger had been diagnosed with an

11

unspecified anxiety disorder and an unspecified mood disorder.  (*Id*.).  Sadger had

shown mild improvement after individual therapy, group therapy, and psychiatric

medications, specifically, Klonopin.  (*Id*.).  Sadger's prognosis was "[f]air."  (*Id*.).

Skaggs indicated that Sadger demonstrated a moderate loss in understanding and

memory, a marked loss in sustained concentration and persistence, a moderate loss

in social interaction, and a moderate loss in adaption.  (*Id*., PageID.789-790).

Skaggs opined that Sadger's "[a]nxiety increase[d] severity of physical pain."  (*Id*.,

PageID.790).  He further opined that Sadger would miss more than four days of

work each month.  (*Id*., PageID.791).

On July 2, 2019, Skaggs submitted a letter regarding Sadger's health.  (*Id*.,

PageID.799).  Skaggs stated that Sadger was diagnosed with "Panic Disorder,

Mood Disorder, and likely PTSD related to a traumatic brain injury he sustained in

2000."  (*Id*.).  Sadger had been participating in both individual and group therapy

in addition to psychiatric services since January of 2011.  (*Id*.).  Skaggs explained

that Sadger "strive[d] to achieve his therapeutic goals, often walking to therapy due

to a lack of transportation."  (*Id*.).  Sadger had "made some progress," however, he

"struggle[d] to regulate his emotions."  (*Id*.).  Skaggs opined that due to Sadger's

mental and physical health issues he would be unable to "sustain any kind of

meaningful employment."  (*Id*.).

> III.   Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Sadger was not disabled under the Act. At Step One, the ALJ found that Sadger had not engaged in substantial gainful activity since January 1, 2017 (alleged onset date). (ECF No. 11, PageID.53). At Step Two, the ALJ found that he had the severe impairments of degenerative disc disease, essential hypertension, migraine headaches, obesity, unspecified affective disorder, unspecified anxiety disorder, borderline personality disorder, and substance abuse disorder. (*Id.*, PageID.54). At Step Three, the ALJ found that Sadger's impairments, whether considered alone or in combination did not meet or medically equal a listed impairment. (*Id.*, PageID.54-56).

The ALJ then assessed Sadger's residual functional capacity (RFC), concluding that he was capable of performing medium work. (*Id.*, PageID.56). The ALJ further found that "the claimant can frequently climb, balance, stoop,

kneel, crouch, and crawl.  He can understand, remember, and carry out simple, routine tasks and make simple work-related decisions.  The claimant can tolerate occasional interaction with supervisors, coworkers, and the public.  He can adapt to occasional changes in a routine work setting." (*Id.*).

At Step Four, the ALJ found that Sadger could perform his past relevant work as a custodian, packer, and machine operator.  (*Id.*, PageID.60).  The VE testified that a person limited to medium work with Sadger's age, education, and work experience could perform those three jobs.  (*Id.*, PageID.109).  As a result, the ALJ concluded that Sadger was not disabled under the Act.  (*Id.*, PageID.61).

IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

15

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence." 42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc.*

*Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . .

. presupposes that there is a zone of choice within which the decisionmakers can go

either way, without interference by the courts.") (quoting *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are

therefore subject to multi-tiered review, but those findings are conclusive unless

the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The

Court must " 'take into account whatever in the record fairly detracts from [the]

weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395

(6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487

(1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding even if there is substantial evidence in the record that

would have supported an opposite conclusion."  *Blakley*, 581 F.3d at 406 (internal

quotations omitted).  Finally, even if the ALJ's decision meets the substantial

evidence standard, "a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant

on the merits or deprives the claimant of a substantial right."  *Rabbers v. Comm'r*

*of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (internal quotations omitted).

V.    Analysis

Sadger presents the following three arguments in support of his motion for

summary judgment: (1) the ALJ erred in not finding that Sadger met and/or

equaled Listing 12.04, 12.06, or 12.08; (2) the ALJ erred in not adequately

considering the impact of Sadger's severe impairments on his functional ability as

required by Social Security Ruling ("SSR") 96-8p; and (3) the ALJ erred when she

found that Skaggs' opinion as to Sadger's mental capacity was not supported by

substantial evidence.  Each argument is considered in turn below.

A.    Listed Impairments

Sadger first argues that his impairments meet or equal listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and/or 12.08 (personality and impulse control disorders). At Step Three of the sequential evaluation process, he bears the burden of establishing so.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).  To prevail, he must prove that his impairments meet "all of the specific medical criteria" in the listing, or "present medical findings equal in severity to all of the criteria for the one most similar listed impairment."  *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990) (emphasis in original).

The Sixth Circuit has recognized that "medical equivalence" can be found in three ways:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria;

> (2) the claimant has a non-listed impairment that is "at least of equal medical significance" to a listed impairment; or

> (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 n. 2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526); *see also* SSR 17-2p, 2017 WL 3928306, at *2 (Mar. 27, 2017).

18

For listings 12.04, 12.06, and 12.08, the regulations contain identical criteria under paragraph "B" but differing criteria under paragraph "C"; the criteria under either B or C must be met to demonstrate that the listing is met.  As the ALJ explained, under the "B" criteria the listings can be met by having one extreme or two marked limitations among the four categories of functioning:

- understanding, remembering, or applying information
- difficulties interacting with others
- limitations in maintaining concentration, persistence, or pace
- difficulty adapting or managing one's self

A "marked" limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An "extreme" limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

(ECF No. 11, PageID.55); *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §§ 12.04B, 12.06B, 12.08B.  The ALJ found that Sadger had a mild limitation in the first category and moderate limitations in the others.  (*Id.*, PageID.55-56).

Sadger argues that he is at least markedly impaired in his ability to interact with others and in maintaining concentration, persistence, and pace.  (ECF No. 13, PageID.870).  To support this, he cites having changed employers approximately twenty times since 2012, which he explained at the hearing was due primarily to conflicts with coworkers and supervisors as well as panic attacks.  (ECF No. 13, PageID.869 (citing ECF No. 11, PageID. 74-92, 96-100, 102-103, 239-244)).  He also notes that his therapy records with Skaggs reveal "constant anxiety problems

that have led to conflicts with his son and have hurt plaintiff's ability to lead any kind of life outside of living with his mother and grandmother" and that his "isolated help of a friend does not prove his ability to perform work on a sustained basis." (ECF No. 13, PageID.869-870 (citing ECF No. 11, PageID. 465- 604; 652-734)).

Regarding interacting with others, the ALJ noted Sadger's irritability and reported difficulties with this domain, but found that the record showed an orientation to personal interactions and an ability in general to communicate effectively with others. (ECF No. 11, PageID.56). Supporting this, the ALJ cited Sadger's various activities with a friend, including assisting with moving a deer out of a swamp, scrapping metal from a basement, and lifting and pulling a shed. (*Id.*, PageID.764, 766, 771). He also cited Sadger's relationship and activities with his son, including basketball and shooting a bow and arrow. (*Id.*, PageID.276, 422, 276, 519, 785). In addition, the ALJ noted Sadger's engagement in individual and group therapy, which supports Sadger's ability to listen and talk with others. (*Id.*, PageID.277, 652-734, 824). Finally, the ALJ found that Sadger had no obvious difficulty interacting with others during the hearing, including communicating with the ALJ, cooperating, and following the hearing instructions. (*Id.*, PageID.66-112).

20

The Sixth Circuit has found a moderate limitation in this domain to be supported based on a claimant "talking to family two to three days a week," "spending time with friends," and "interactions with friends, family, and doctors in the record." *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 818 (6th Cir. 2020). Other cases have noted that "attending doctor's appointments and group therapy sessions" support a claimant's ability to interact with others, *Blain v. Comm'r of Soc. Sec.*, No. 1:17-CV-844, 2018 WL 4178200, at *5 (W.D. Mich. Aug. 15, 2018), *report and recommendation adopted,* 2018 WL 4150170 (W.D. Mich. Aug. 30, 2018), and that a mild limitation in social functioning (a precursor of "interacting with others") can be supported by a claimant "appear[ing] to have no limitations interacting at the hearing with his representative or the undersigned," *Bouschor v. Colvin*, No. 2:15-CV-47, 2016 WL 336099, at *4 (W.D. Mich. Jan. 28, 2016). *See also Trejo v. Comm'r of Soc. Sec.*, No. 16-11537, 2017 WL 3768943, at *2 (E.D. Mich. Aug. 31, 2017) (claimant's "ability to perform household chores, his interactions with family, and his cooperation at his hearing before the ALJ" supported a mild limitation in claimant's RFC).

As to concentration, persistence, and pace (CPP), the ALJ recognized Sadger's difficulty coping with stress and changes in routine, as well as his difficulty sleeping and low energy throughout the day. (ECF No. 11, PageID.56). However, the ALJ also noted Sadger's alertness during visits with care providers,

his ability to concentrate on watching television and splitting firewood, and "no obvious difficulty paying attention, recalling information, and responding within a reasonable amount of time during the hearing." (*Id*. (citing PageID.276, 392, 422, 519, 785)). *See, e.g., Schaefer v. Comm'r of Soc. Sec.*, No. 13-10105, 2014 WL 562436, at *13 (E.D. Mich. Feb. 13, 2014) (claimant "able to perform odd jobs for his friends and family, watch television, and occasionally fish and hunt" had moderate limitations in CPP); *Bradshaw v. Comm'r of Soc. Sec.*, No. 2:12-CV-12609, 2013 WL 3762940, at *3 (E.D. Mich. July 17, 2013) (moderate limitation in CPP supported where claimant was found "alert, oriented, and goal-directed.").

Elsewhere in the opinion, the ALJ noted that Sadger reportedly went years without seeing a psychiatrist, prepared his own paperwork to request his driver's license be restored, and had intact recent and remote memory as well as "fund of knowledge." (*Id*., PageID.58-59 (citing PageID.476, 669, 674)). These findings, too, support the ALJ's conclusion of moderate limitations in CPP. *See Bradshaw* at *3 (intact memory and average intellectual function); *Sharp v. Comm'r of Soc. Sec.*, No. 5:14-CV-12829, 2015 WL 5729090, at *6 (E.D. Mich. Sept. 30, 2015) (normal fund of knowledge); *England v. Comm'r of Soc. Sec.*, No. 15-12818, 2016 WL 8114219, at *14 (E.D. Mich. July 11, 2016), *report and recommendation adopted,* 2016 WL 5939288 (E.D. Mich. Oct. 13, 2016) (inconsistent mental health treatment). As such, the ALJ's findings of moderate limitations of Sadger's ability

22

to interact with others and maintain concentration, persistence, and pace are supported by substantial evidence.

The ALJ also found that Sadger did not meet the paragraph "C" criteria for any of the above listings. To satisfy the "C" criteria, Sadger would need to demonstrate a "serious and persistent" mental impairment with evidence of both: (1) relevant treatment that is ongoing and that diminishes the symptoms and signs of the impairment; and (2) marginal adjustment; that is, minimal capacity to adapt to changes in environment or to demands that are not already part of the claimant's daily life. *See, e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C. Regarding the term "marginal adjustment" in C(2):

> "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. § Pt. 404, Subpt. P, App. 1-Part-A2, § 12.00G(2)(c).

Sadger alleges that his life is centered around television and avoiding any changes in his life. However, the ALJ correctly adduced that Sadger has not

demonstrated a reliance upon mental health treatment in order to function, an

inability to function outside the home, or a need for psychosocial supports.  (ECF

No. 11, PageID.56).  There is likewise no evidence that Sadger has suffered

episodes of deterioration requiring him to be hospitalized or absent from work due

to mental impairments.  Thus, the ALJ is correct that the "C" criteria was not

satisfied.

### B.   Mental Impairments in the RFC

Sadger also argues that the RFC did not adequately incorporate his severe

mental impairments.  A person's RFC is the most he is able to do despite any

physical, mental, or environmental limitations resulting from his impairments.  20

C.F.R. § 404.1545(a)(1).  The ALJ is responsible for assessing residual functional

capacity and takes into account all of the relevant medical and other evidence in

doing so.  *Id.* §§ 404.1545(a), 404.1546(c).  This includes statements about the

claimant's abilities provided by medical sources, whether or not they are based on

formal medical examinations, and non-medical statements from the claimant or

others, including those regarding daily activities.  *Id.* § 404.1545(a)(3); SSR 96-8p,

1996 WL 374184, at *5 (July 2, 1996).

Sadger notes that the ALJ may not infer an ability to perform substantial

gainful activity "merely from the fact that the mental disorder is not of listing

severity," as is the case here.  SSR 85-16, 1985 WL 56855, at *1 (Jan. 1, 1985).

24

For "mental impairments of lesser severity, such inability [to perform substantial

gainful activity] must be demonstrated through a detailed assessment of the

individual's capacity to perform and sustain mental activities which are critical to

work performance." *Id*. Similarly, SSR 85-15 states:

> Where a person's only impairment is mental, is not of listing severity,
> but does prevent the person from meeting the mental demands of past
> relevant work and prevents the transferability of acquired work skills,
> the final consideration is whether the person can be expected to perform
> unskilled work. The basic mental demands of competitive,
> remunerative, unskilled work include the abilities (on a sustained basis)
> to understand, carry out, and remember simple instructions; to respond
> appropriately to supervision, coworkers, and usual work situations; and
> to deal with changes in a routine work setting. A substantial loss of
> ability to meet any of these basic work-related activities would severely
> limit the potential occupational base. This, in turn, would justify a
> finding of disability because even favorable age, education, or work
> experience will not offset such a severely limited occupational base.

1985 WL 56857, at *4 (Jan 1, 1985).

Sadger argues that the ALJ's analysis of his mental impairments falls short

of that required by Social Security regulations. However, as referenced above, the

ALJ considered medical evidence that Sadger was alert; oriented to time, place,

and person; and had normal recent and remote memory during assessments. (ECF

No. 11, PageID.55 (citing PageID.392, 422, 804, 812, 839, 843)). Further, the ALJ

noted Sadger's various activities including assisting his friend with tasks, engaging

in hobbies with his son, and watching television, all of which are relevant in

assessing Sadger's ability to concentrate and interact with others in the workplace.

25

(*Id.*, PageID.55-56 (citing PageID.276, 392, 422, 519, 764, 766, 771, 785)).  The

ALJ also noted Sadger's engagement in individual and group therapy and that

Sadger exhibited no obvious difficulties in paying attention, recalling information,

or interacting with others during the administrative hearing.  (*Id.*, PageID.55-56).

     In her RFC analysis, the ALJ found that "[o]bjectively, the claimant's mood,

thoughts, and behavior appeared to be normal."  (*Id.*, PageID.58 (citing

PageID.654, 669, 723-725)).  She also noted that Sadger had fair judgment and

some insight into his health conditions.  (*Id.*, PageID.59 (citing PageID.669)).  And

she reiterated that Sadger was able to work an earn substantial income in 2016

despite these conditions; was able to look for work; watch movies and television;

spend a weekend at his friend's house; engage in other activities with his friend

and his son; and prepare driver's license paperwork.  (*Id*, PageID.59).  Further, the

ALJ noted Sadger's relatively conservative mental health treatment, as Sadger

received counseling and medication, but never required emergent or inpatient

psychiatric care, and at one point went over two years without seeing a

psychiatrist.  (*Id*, PageID.58 (citing PageID.476)).  *See Rudd v. Comm'r of Soc.*

*Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) ("minimal and conservative treatment"

is a valid reason to discount severity); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272,

283-84 (6th Cir. 2009) (gap in treatment inconsistent with a claim of disability).

Sadger argues that his mental issues result in frequent anger bursts and loss of

employment, citing to his counsel's own summary of his treatment notes with Jay

Skaggs, (ECF No. 13-1), but does not point to any specific records that the ALJ did

not consider.  As the Commissioner notes, Sadger's treatment notes with Skaggs

frequently reflected an unremarkable mood, thought process, and behavior.  (ECF

No. 15, PageID.912 (citing ECF No. 11, PageID.467, 471, 477, 481, 485, 493, 495,

497, 499, 503)).

Taking the evidence and Sadger's testimony into account, the ALJ found

that Sadger had the mental RFC to "understand, remember, and carry out simple,

routine tasks and make simple work-related decisions," "tolerate occasional

interaction with supervisors, coworkers, and the public," and "adapt to occasional

changes in a routine work setting."  (*Id.*, PageID.56).  Sadger argues that this RFC

does not sufficiently accommodate his severe impairment of depression or his

moderate limitations in CPP.  He relies in part on *Benton v. Comm'r of Soc. Sec.*,

511 F. Supp. 2d 842, 849 (E.D. Mich. 2007), which held that an RFC of "simple,

routine, repetitive work" was insufficient to accommodate the plaintiff's moderate

deficiency in CPP.  He also relies on *Eiseler v. Barnhart*, 344 F. Supp. 2d 1019,

1028 (E.D. Mich. 2004), in which the court found that claimant's severe

impairment of depression was not adequately accommodated by a limitation to

"unskilled work."  "However, these cases predate the Sixth Circuit decisions

finding no error where the ALJ omitted functional limits from an RFC in the

absence of record evidence that provided for specific, concrete limitations on the claimant's ability to maintain concentration, persistence or pace." *Miller v. Comm'r of Soc. Sec.*, No. 1:16-CV-1121, 2018 WL 526553, at *7 (S.D. Ohio Jan. 23, 2018), *report and recommendation adopted,* 2018 WL 1532527 (S.D. Ohio Mar. 29, 2018).  In *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014), the Sixth Circuit found that a "limitation to simple, routine, and repetitive tasks adequately conveys [claimant's] moderately-limited ability 'to maintain attention and concentration for extended periods.' "  In the absence of evidence that the claimant had limitations on performing simple, repetitive, routine tasks, the limitation to such tasks accommodated the claimant's functional limitations on maintaining attention, concentration, or pace.  *Id*.  Similarly, in *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 635 (6th Cir. 2016), the Sixth Circuit found that in the absence of "evidence in the record that provides for specific, concrete limitations on [claimant's] ability to maintain concentration, persistence or pace while doing simple, unskilled work," the limitation to simple, unskilled work accommodated the claimant's impairments.

There is no bright-line rule that moderate deficiencies in CPP must be incorporated into the RFC with specific language.  *Id*.; *Smith v. Comm'r of Soc. Sec.*, No. 13-10862, 2013 WL 6094745, at *8 (E.D. Mich. Nov. 20, 2013). Instead, Sadger bears the burden to show the need for additional functional

limitations in the RFC. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The same is true for a hypothetical question posed to the VE that matches the RFC. *Kirchner v. Colvin*, No. 12-CV-15052, 2013 WL 5913972, at \*11 (E.D. Mich. Nov. 4, 2013).

Sadger also contends that the ALJ violated SSR 16-3p by discounting his subjective symptoms based solely on objective medical evidence. The Social Security Regulations establish a two-step process for evaluating a claimant's subjective symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). Under SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 16-3p. This analysis and the conclusions drawn from it – formerly termed a "credibility" determination – can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F.App'x 977, 981 (6th Cir. 2011); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F.App'x 113, 119 n.1 (6th Cir. 2016) (explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' ").

The ALJ must first confirm that objective medical evidence of the underlying condition exists, and then determine whether that condition could

29

reasonably be expected to produce the alleged pain, considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side-effect of any medication; (5) treatment, other than medication received; (6) any means used to relieve pain; and (7) other factors concerning functional limitations.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.

Sadger's argument that the ALJ violated SSR 16-3p is misplaced.  The regulation requires ALJs to assess the consistency of the claimant's statements with the objective medical evidence:

> [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner.

SSR 16-3p, at *8.  This cannot be the sole factor for discounting Sadger's statements, but it must be considered.  As outlined above, the ALJ found that the normal and unremarkable results at Sadger's objective examinations, along with his history of conservative treatment, were inconsistent with the intensity of his impairments to which he testified.  (ECF No. 11, PageID.57).  The ALJ also analyzed Sadger's daily activities, a factor under 20 C.F.R. § 404.1529(c)(3)(i), in coming to her conclusions.  Sadger objects that the activities cited by the ALJ do not prove that he can sustain employment, but it was entirely appropriate for the

ALJ to consider these activities to assess Sadger's statements regarding his impairments. *See Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 441–42 (6th Cir. 2017) ("The ALJ cited these activities as evidence that Shepard's testimony about the severity of her symptoms and her limited lifestyle was 'not entirely credible,' not to demonstrate that she was capable of light work.").

Sadger further says that the ALJ erred because she did not explicitly consider every factor under 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) in her subjective symptom evaluation. Specifically, Sadger faults the ALJ for disregarding the side effects of his medication and being "improperly focused on the need for objective evidence in evaluating the plaintiff's subjective complaints." (ECF No. 13, PageID.875). But "[a]llegations of a medication's side effects must be supported by objective medical evidence." *McLeod v. Comm'r of Soc. Sec.*, No. 1:18-CV-1396, 2020 WL 1501914, at *5 (W.D. Mich. Mar. 30, 2020) (citations and quotations omitted). The only evidence cited by Sadger regarding side effects is from Skaggs' medical opinion, noting that Klonopin causes drowsiness, dizziness, weakness, headaches, and sleep disturbance. (ECF No. 11, PageID.787). The ALJ did not find Skaggs' opinion persuasive, for reasons examined below. (*Id.*, PageID.59-60). But the ALJ noted Sadger's Klonopin prescription and considered his claims of headaches, difficulty sleeping, and

muscle weakness.  (*Id.*, PageID.57-58).  Sadger has not pointed to any evidence

that he suffered from a side effect of Klonopin that was not considered by the ALJ.

Failing to specifically refer to side effects in the decision is not ground for

remand.  *French v. Comm'r of Soc. Sec.*, No. 15-12687, 2016 WL 3951419, at *13

(E.D. Mich. June 30, 2016), *report and recommendation adopted,* 2016 WL

3924111 (E.D. Mich. July 21, 2016).  Furthermore, an ALJ's narrative need not

explicitly discuss each of the seven factors identified in 20 C.F.R. §

404.1529(c)(3); rather an ALJ's decision "should provide enough assessment to

assure a reviewing court that he or she considered all relevant evidence."  *Cross v.*

*Comm'r of Soc. Sec.,* 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) (citing *Blom v.*

*Barnhart,* 363 F.Supp.2d 1041, 1054 (E.D. Wis. 2005)); *see also Bowman v.*

*Chater,* 132 F.3d 32 (table), 1997 WL 764419, at *4 (6th Cir.1997) ("While this

court applied each of [the 1529(c)(3) factors in [*Felisky v. Bowen,* 35 F.3d 1027,

1039–1040 (6th Cir.1994)] we did not mandate that the ALJ undergo such an

extensive analysis in every decision.  Rather, we held that where the medical

record does not contain objective evidence to support pain allegations, such

allegations may not be dismissed without a review of non-medical factors."); *Rife*

*v. Comm'r of Soc. Sec.,* No. 10–11175, 2011 WL 689655, at *2 (E.D. Mich. Feb.

16, 2011) ("[A]n ALJ's credibility determination need only be 'sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight

the adjudicator gave to the individual's statements and the reasons for that weight.' ") (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 238 (6th Cir. 2007)). Given the ALJ's consideration of the relevant factors here, and Sadger's failure to point to additional unconsidered factors that would render the RFC insufficient, the undersigned finds no error with the ALJ's subjective symptom analysis or her incorporation of Sadger's mental impairments into the RFC.

### C.    ALJ's Treatment of Opinion Evidence

Sadger argues that the ALJ's reasons for finding that Skaggs' opinion was not persuasive because it was not consistent with the other evidence in the record is not supported by substantial evidence.  The Commissioner disagrees.  He argues that substantial evidence supports the ALJ's assessment of Skaggs' opinion and that Skaggs' opinion was not well supported.

The SSA recently revised its medical evidence rules.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01.  Under the old rules, an ALJ had to give the medical opinion of a claimant's treating physician controlling weight as long as it "[was] well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record (the "treating physician rule").  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  However, for claims filed on or after March 27, 2017, like

Sadger's, the ALJ must now articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record."  20 C.F.R. §§ 404.1520c(b), 416.920c(b).

The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the most important factors and the ALJ must explain how she considered these factors in her decision.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  "Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of [her] reasoning." *White v. Comm'r of Soc. Sec.*, No. 1:20-CV-00588-JDG, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021).

Under the prior rule, the ALJ would not have needed to separately consider or weigh Skaggs' opinion at all. *See Banks v. Comm'r of Soc. Sec.*, No. 1:12-CV-1355, 2014 WL 684697, at *8 (W.D. Mich. Feb. 21, 2014) ("As the ALJ properly recognized, because Skaggs is a therapist his opinion is not entitled to any particular deference.").  Under the new regulations, Skaggs is a "medical source," 20 C.F.R. § 404.1502(d), and opinions from all medical sources are considered

34

under the same guidelines.  20 C.F.R. §§ 404.1520c, 404.1513.  Skaggs does not

qualify as an "acceptable medical source" as defined by 20 C.F.R. § 404.1502(a),

but this only governs whether his opinion can be used to establish a medically

determinable impairment.  20 C.F.R. § 404.1521.  Once this has been established,

there is no longer a divide between medical sources and "acceptable" medical

sources, though specialization is one of the factors in the ALJ's analysis.  20

C.F.R. § 404.1520c(c)(4).

Here, the ALJ stated the following about Skaggs' opinion:

Jay Skaggs, LPC, a treating, examining counselor completed a mental
work capacity form for the claimant in June 2019 (9F).  Mr. Skaggs
also wrote a statement in support of the claimant's application in July
2019 (11F).  Mr. Skaggs indicated the claimant had "marked" mental
work limitations (i.e. the four domains); and would miss work more
than four days each month.  Mr. Skaggs described how the claimant had
difficulty regulating emotions.  Mr. Skaggs felt the claimant would
become overwhelmed with worry, have panic attacks, and be unable to
sustain any kind of employment (9F and 11F).  I do not find these
assessments or statements persuasive because, for the reasons
explained throughout this decision, the evidence supports my finding
the claimant's mental work function is "mildly to moderately" limited
by his depression, anxiety, and anger.  The evidence does not support
the degree of limitations assigned by Mr. Skaggs because the claimant
is able to live independently, take care of himself, and manage his own
resources.  He is mentally able to repair a car and build a shed.

Mr. Skaggs concluded the claimant was unable to sustain any kind of
meaningful employment (Jul 2019, 11F).  For purposes of Social
Security eligibility, the conclusion regarding an individual's ability to
work rests with the Commissioner of Social Security.  Moreover, the
evidence does not support Mr. Skaggs' conclusion.  My conclusion is
supported by the preponderance of the evidence that shows the
claimant's mental health care is conservative and outpatient.  Mr.

Skaggs statement is not consistent with the opinion of the vocational expert that will be addressed later in this decision. This decision is supported by the preponderance of the evidence.

Next, Mr. Skaggs speculated that the claimant would be expected to miss at least four days of work each month due to his impairments and treatments (9F:5). Mr. Skaggs apparently believed the claimant had a head injury that had affected the claimant's ability to plan ahead and regulate emotions (9F:5). I do not find this assessment persuasive because there is no evidence the claimant had a head injury and studies of his brain were normal (see MRI 1F:3). Further, there is no evidence the claimant has regularly missed or canceled any of his appointments. Indeed, Mr. Skaggs stated that if the claimant did not have transportation to an appointment, the claimant would walk to his appointment. Mr. Skaggs also believed the claimant could plan ahead well enough to manage his own resources (see 11F:6). For these reasons, I find this part of Mr. Skaggs' assessment is not persuasive. In sum, the above residual functional capacity assessment is supported by the preponderance of the evidence.

(ECF No. 11, PageID.59-60).

Sadger correctly notes that supportability and consistency are the most important factors considered in determining the persuasiveness of a medical opinion. (ECF No. 13, PageID.878 (citing 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)). However, he then opines that the "most significant factor … would seem to be" the treater's "[r]elationship with the claimant." (*Id.*, PageID.879). As the Commissioner notes, this view may be based on the former "treating physician rule" that is no longer in effect. The treatment relationship is still a factor, and there is no indication that the ALJ failed to consider the seven-year treatment history between Skaggs and Sadger. *See* ECF No. 11, PageID.58

36

(noting that Sadger received counseling since 2011).  The ALJ also noted that Skaggs was a treating and examining counselor.  (ECF No. 11, PageID.59).  But the ALJ was required to explicitly consider the supportability and consistency of Skaggs' opinion above all other factors.

Considering those factors, the ALJ noted that the degree of limitations assigned by Skaggs was counter to Sadger's ability to live independently, take care of himself, and manage his own resources, as well as the mental ability Sadger has shown in being able to repair a car and build a shed.  (*Id*.).  The ALJ also referred back to Sadger's conservative, outpatient mental health treatment, which is not consistent with multiple marked limitations.  (*Id*., PageID.60).  And regarding Skaggs' opinion that Sadger would miss four or more days of work each month, the ALJ noted that Sadger did not regularly miss or cancel treatment appointments, even walking to them when he did not have transportation.  (*Id*.).  The ALJ also noted that despite Skaggs' belief that Sadger had suffered a head injury that affected his abilities, there was no objective evidence of a head injury in the record, and Sadger's brain MRI was normal.  (*Id*. (citing PageID.367)).  *See* SSR 96-8p, 1996 WL 374184, at *2 (limitations must be based on medically determinable impairments).

Sadger takes issue with the ALJ's characterization of his daily activities, stating that he lives with his mother, spends most of his time watching television,

and only occasionally partakes in activities such as shed building and car repair. (ECF No. 13, PageID.879). However, as detailed above in the listing analysis, case law supports the ALJ's findings that these activities are indicative of moderate mental limitations, not marked limitations as assessed by Skaggs. In addition, Sadger does not dispute that his conservative mental health treatment undercuts Skaggs' opinion. *See Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (doctor's proposed limitations were inconsistent with claimant's conservative treatment and daily activities). Thus, the ALJ's discounting of Skaggs' proposed marked limitation is supported by substantial evidence in the record.

Moreover, Skaggs' conclusion that Sadger would miss four days of work per month is not considered a medical opinion under the regulations. *See, e.g., Murray v. Comm'r of Soc. Sec.*, No. 1:10-cv-297, 2011 WL 4346473, at *7 (W.D. Mich. Aug. 25, 2011) ("A treating physician's estimate of how often a patient who is not working would likely be absent from work if [s]he had a job is not a medical opinion, and it is not entitled to any particular weight."); *Valdes v. Comm'r of Soc. Sec.*, No. 1:08-cv-872, 2010 WL 911181, at *8 (W.D. Mich. Mar. 12, 2011) ("A treating physician's estimate of how often a patient who is not working would likely be absent from work if she had a job ... is not a medical opinion, and it is not entitled to any particular weight, especially in cases such as this, where the doctor's

statement provides no explanation regarding how the conclusion was reached, or any reference to the specific, objective medical evidence supporting it.”). Likewise, Skaggs' opinion that Sadger is unable to sustain meaningful employment need not be considered because as the ALJ noted, it is a question reserved to the Commissioner. 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i). Therefore, no part of Skaggs' opinion was due additional weight in the ALJ's decision.

## VI. Conclusion

For the reasons set forth above, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 15) be GRANTED, Sadger's Motion for Summary Judgment (ECF No. 13) be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

Dated: August 23, 2021                     s/Kimberly G. Altman
Detroit, Michigan                          KIMBERLY G. ALTMAN
                                           United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation. Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 23, 2021.

s/Marie E. Verlinde
MARIE E. VERLINDE
Case Manager